UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EDWARD EINHORN,

Plaintiff,

-against-

05 Civ. 8600 (LAK)

MERGATROYD PRODUCTIONS, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 4·12·06

**MEMORANDUM OPINION**

Appearances:

David A. Einhorn
ANDERSON, KILL & OLICK, P.C.
*Attorneys for Plaintiff*

Toby M. J. Butterfield
COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP
*Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

We speak of "making a federal case" out of something to express the sentiment that someone is blowing something out of proportion. Plaintiff Edward Einhorn, represented by his attorney brother, has made this federal case out of a dispute over $1,000.

*Facts*

The parties to this case all aspire to success in the theater. Plaintiff Einhorn hopes to direct. Defendant Nancy McLernan is the author of the play *Tam Lin*, a work that was performed

approximately eight times "Off Off Broadway" and that is at the core of this dispute. Defendant Jonathan X. Flagg was its producer.[1]

According to the second amended complaint, the allegations of which are taken as true for purposes of this motion to dismiss,[2] defendants in August 2004 asked Einhorn to direct and "to create blocking and choreography" for the play, which was scheduled to run on eight days in October.[3] McLernan conveyed Flagg's offer to pay him $1,000 to do so, and defendants told him that a written contract would be forthcoming.[4] Einhorn claims that he accepted the offer "by proceeding to coach the cast, work with the set designers and create the choreography and blocking script"[5] but there is no suggestion that a written contract ever was signed.

Einhorn claims that he "authored an original blocking script for stage performance of the Play" and that it "included elements of choreography for dance, fight and black-light puppetry."[6] Prior to the opening, defendants posted videos on their web site showing the blocking

---

1 The other defendants are affiliates of Flagg.

2 The record contains an affidavits and other materials outside the complaint at issue. The Court declines to consider them or to convert the motion into one for summary judgment. *See* FED. R. CIV. P. 12(b).

3 Second amended complaint ("Cpt") ¶¶ 11-12.

4 *Id.* ¶¶ 13-14 & Ex. 1.

5 *Id.* ¶ 15.

6 *Id.* ¶¶ 21-22.

In an affidavit submitted on an earlier motion, Einhorn described his authorship as "*writing* the blocking and choreography script." Einhorn Aff. (docket item 12) ¶ 9 (emphasis added).

and choreography.[7]

On October 20, 2004, the day before the scheduled opening, Einhorn was terminated.[8] His demand for payment of the $1,000 was spurned.[9] Curiously, he claims on the one hand that his work had been completed by the time he was let go and, on the other hand, that his termination was an anticipatory breach of the contract,[10] the latter allegation presupposing that his work had not been completed.

In any case, the show opened and ran through the eight scheduled performances in October, using the blocking and choreography script that Einhorn claims to have prepared.[11] Further, defendants allegedly posted a full-length performance of the show on their web site[12] and placed metatags[13] containing Einhorn's name on their web sites, a practice called "metastuffing" which results in Internet search engines directing web surfers who entered Einhorn's name in search

---

7 Cpt. ¶ 24.

8 *Id.* ¶ 16.

9 *Id.* ¶ 17.

10 *Id.* ¶¶ 19-20.

11 *Id.* ¶ 28.

12 *Id.* ¶¶ 29-31.

13 "A 'metatag' is a list of words hidden in a web site acting as an index or reference source identifying the content of the web site for search engines." *PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 248 n.2 (6th Cir. 2003) (quoting 4 J. THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 25:69 (4th ed. 1996)).

requests to defendants' web sites.[14]

On December 10, 2004, Einhorn obtained a certificate of registration of copyright. The registration form described the nature of the work as "blocking and choreography" and the title as "blocking and choreography script for Tam Lin."[15] The certificate includes a copy of McClernan's script for the play which contains both stage directions enclosed in parentheses and italicized interlineations, the latter of which are the sole focus of Einhorn's claim.[16]

Einhorn then brought this action. The second amended complaint contains claims for copyright infringement, breach of contract and violation of Sections 43(a)(1) of the Lanham Act[17] and 349 of the New York General Business Law.[18] The theory of the copyright infringement claim is that the use of the blocking and choreography script infringed Einhorn's copyright. The contract claim relates to the failure to pay the $1,000, although plaintiff cannot seem to decide whether the alleged breach was anticipatory. The remaining two claims are based on the metastuffing – the use of Einhorn's name in metatags on defendants' web sites.

In addition, plaintiff's amended complaint asserted a claim for common law misappropriation, which the Court initially dismissed as preempted by the Copyright Act. On

---

14 *Id.* ¶¶ 33-35.

15 *Id.* Ex. 2.

16 The former presumably are those of the playwright. Einhorn claims copyright only in the italicized interlineations. Pl. Mem. (docket item 11) at 7.

17 15 U.S.C. § 1125(a)(1).

18 N.Y. GEN. BUS. L. § 349.

reconsideration, however, it reinstated the claim, without prejudice to the preemption argument, only to the extent that it is asserted as an alternative to the copyright infringement claim.

Defendants move to dismiss.

*Discussion*

*A. The Contract Claim*

Einhorn claims that the following portion of McLernan's e-mail to him was an offer that he accepted by subsequent performance:

> "I spoke with Jonathan [Flagg] and he feels that our budget can handle the additional director's fee, so we're OK with paying you $1000. I hope this will sway you to commit to this project. Please let me know as soon as possible if you'll do it."[19]

Defendants seek dismissal on the theory that this communication was insufficiently specific to give rise to a contract and, in any case, that evidence that the parties contemplated the execution of a written contract demonstrates that there was no intention to be bound absent a writing subscribed by both sides.

Defendants' arguments are different ways of saying much the same thing – that the e-mail did not create in plaintiff the power to form a contract either by acceptance or by performance. And the answer, for purposes of this motion, is the same regardless of how the issue is framed.

No particular form is necessary to make an offer. All that is required is "[c]onduct that would lead a reasonable person in the other party's position to infer a promise in return for

---

19 Cpt. ¶ 13 & Ex. 1.

performance . . ."[20] Defendants surely may argue that a communication of a willingness to pay a directorial fee of $1,000, standing alone, was so far from a comprehensive statement of the terms of the proposed relationship as to make Einhorn's alleged inference of a promise unreasonable, thus defeating any conclusion that there was an offer. But the Court certainly cannot say, as it would be obliged to do in order to grant the motion on this basis, that no reasonable trier of fact could find otherwise.[21]

The defendants' other argument yields to a similar analysis. Our Circuit divides putative agreements made in circumstances in which the parties contemplate a later writing into two types. So-called Type I preliminary agreements are regarded as complete and "reflecting a meeting of the minds on 'all the issues perceived to require negotiation.'"[22] "'Type II' preliminary agreements, by contrast, are 'binding only to a certain degree,' reflecting agreement on 'certain major terms, but leave other terms open for further negotiation.'"[23] While "there is a strong presumption against finding binding obligations in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents,"[24] discrimination between binding and non-binding preliminary agreements depends upon the parties'

---

20

1 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.10, at 252 (2004).

21

*See, e.g., Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

22

*Brown v. Cara,* 420 F.3d 148, 153 (2d Cir. 2005) (quoting *Adjustrite Sys. Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 548 (2d Cir. 1998)).

23

*Brown,* 420 F.3d at 153 (quoting *Adjustrite,* 145 F.3d at 548).

24

*Brown,* 420 F.3d at 154 (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir. 1989) (internal quotation marks omitted)).

intent and requires consideration of:

> "(1) whether there is an expressed reservation of the right not to be bound in the absence of a writing;
>
> "(2) whether there has been partial performance of the contract;
>
> "(3) whether all of the terms of the alleged contract have been agreed upon; and
>
> "(4) whether the agreement at issue is the type of contract that is usually committed to writing."[25]

In this case, notwithstanding the alleged reference to a later written contract, there was no express reservation of the right not to be bound in the absence of a writing. It is undisputed that there was at least part performance. It is unclear whether all of the terms were agreed upon, and this record does not permit determination as a matter of law of whether an agreement to direct eight performances of an Off Off Broadway play for $1,000 is the type of contract that usually is committed to writing. Accordingly, the Court is unable to say that plaintiff could prove no facts that would entitle him to relief on the contract claim.

### *B. Metastuffing*

Einhorn claims that defendants' use of Einhorn's name on metatags associated with their web sites violated Section 43(a) of the Lanham Act[26] and Section 349 of the New York General Business Law.[27]

---

25 *Brown,* 420 F.3d at 154 (citing *Adjustrite,* 145 F.3d at 549).

26 15 U.S.C. § 1125(a).

27 N.Y. GEN. BUS. L. § 349.

The state law claim fares no better. Section 349 of the General Business Law creates a private cause of action in favor of any person injured by "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."[34] Although the private right of action is not limited to consumers, as opposed to competitors or perhaps others injured by deceptive trade practices, the New York Court of Appeals has made clear that only plaintiffs who suffer an actual, direct, non-derivative injury may recover under Section 349.[35]

Einhorn alleges no such injury. Although he contends that the metastuffing caused people searching for his name to be directed to web sites controlled by defendants, he fails to allege any direct, non-derivative injury as a result. He does not allege, for example, that the alleged metastuffing prevented web surfers from finding his web site or other valid information about him. He claims that it may have misled web surfers about his affiliation with defendants, but it is hard to see how this injured him, especially considering that the complaint alleges such an affiliation for several months in 2004. Further, although several courts have analyzed whether metatags including another party's trademark constitute trademark infringement,[36] such an analysis is not relevant here because the Court already has concluded that Einhorn has not alleged facts sufficient to justify a

---

34

N.Y. GEN. BUS. L. §§ 349(a), (h).

35

*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 207-08, 785 N.Y.S.2d 399, 403-04 (2004).

36

*E.g. Playboy Enter. Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002); *Tdata Inc. v. Aircraft Technical Publishers*, 411 F.Supp.2d 901 (S.D. Ohio 2006); *Eli Lilly & Co. v. Natural Answers, Inc.*, 86 F.Supp.2d 834 (S.D. Ind. 2000).

The state law claim fares no better. Section 349 of the General Business Law creates a private cause of action in favor of any person injured by "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."[34] Although the private right of action is not limited to consumers, as opposed to competitors or perhaps others injured by deceptive trade practices, the New York Court of Appeals has made clear that only plaintiffs who suffer an actual, direct, non-derivative injury may recover under Section 349.[35]

Einhorn alleges no such injury. Although he contends that the metastuffing caused people searching for his name to be directed to web sites controlled by defendants, he fails to allege any direct, non-derivative injury as a result. He does not allege, for example, that the alleged metastuffing prevented web surfers from finding his web site or other valid information about him. He claims that it may have misled web surfers about his affiliation with defendants, but it is hard to see how this injured him, especially considering that the complaint alleges such an affiliation for serveral months in 2004. Further, although several courts have analyzed whether metatags including another party's trademark constitute trademark infringement,[36] such an analysis is not relevant here because the Court already has concluded that Einhorn has not alleged facts sufficient to justify a

---

34 N.Y. GEN. BUS. L. §§ 349(a), (h).

35 *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 207-08, 785 N.Y.S.2d 399, 403-04 (2004).

36 *E.g. Playboy Enter. Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002); *Tdata Inc. v. Aircraft Technical Publishers*, 411 F.Supp.2d 901 (S.D. Ohio 2006); *Eli Lilly & Co. v. Natural Answers, Inc.*, 86 F.Supp.2d 834 (S.D. Ind. 2000).

conclusion that his name was a trademark.[37]

C. *Copyright Infringement*

*1. Copyrightability*

Defendants seek also the dismissal of the copyright infringement claim, arguing that the material Einhorn added to the script "merely states non-protectable 'stage business,'" "is incapable of copyright protection as 'choreography,'" and "cannot be infringed, except perhaps by reproduction of the text . . . which is not alleged."[38]

The motion papers now before the Court do not address a series of questions important to resolution of this claim. For example, the parties have not addressed whether, to what extent, and when Einhorn's alleged contributions were fixed in tangible form. There has been no real analysis of the applicability of the doctrine of *scenes a faire*. Nor have the parties addressed the scope and effect of the certificate of registration given the fact that the copy of the work that was

---

37

The complaint alleges in conclusory terms that defendants' alleged metastuffing constituted unfair competition. Einhorn's memorandum is utterly unilluminating as to the theory of the claim. Pl. Mem. (Docket item 39) at 9-10. Presumably, however, the argument is that the use of Einhorn's name in the metatags is unfair, perhaps on a theory of misappropriation.

The New York law of unfair competition is quite broad. *See, e.g., Roy Export Co. v. Columbia Broadcasting Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir.), *cert. denied*, 459 U.S. 826 (1982). As noted above, however, plaintiff does not have anything that might be termed a property right in the use of his name, at least absent any allegation of secondary meaning. Nor is there any allegation that Einhorn and the defendants are competitors. Accordingly, there is no colorable claim of unfair competition. As plaintiff has amended the complaint twice before and offered only the most conclusory defense of the sufficiency of this claim in responding to the motion, the Court would decline to permit further amendment less than two weeks before trial even if plaintiff had sought it, which he has not.

38

Def. Mem. at 2.

filed was only the alleged blocking script as distinguished from images of a performance depicting positions and movements. They have not analyzed Einhorn's alleged contributions individually or by category. In consequence, the Court is not in a position to make an informed judgment on defendants' principal contentions.

### 2. *Statutory Damages and Attorneys Fees*

Plaintiff seeks statutory damages and attorneys fees. Defendants contend that he in no event is entitled to such relief in light of Section 412 of the Copyright Act.

Section 412 forecloses any award of statutory damages or attorneys fees for

> "(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
>
> "(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."[39]

The first question therefore is whether the work was published and, if so, when.

In this case, plaintiff claims that the work was published in three respects: (1) defendants posted images of all or part of show on their web site in the period October 8 through October 30, 2004,[40] (2) the play was performed in late October 2004,[41] and (3) defendants again put

---

39 17 U.S.C. § 412.

40 Cpt ¶¶ 29-30, 38.

41 *Id.* ¶¶ 27-28, 38.

images of the performance on their web site at some unspecified point in 2005.[42]

Section 101 of the Copyright Act defines "publication" as "the distribution of copies . . . . of a work to the public by sale or other transfer of ownership, or by rental, lease or lending" and provides that "[a] public performance or display of a work does not of itself constitute publication."[43] In consequence, the October 2004 performances did not constitute publication.[44]

The same definition dooms Einhorn's claim that the posting of performances of the show on the Internet constituted publication, even assuming *arguendo* that Einhorn may rely upon defendants' actions, some of which are said to have infringed his alleged rights, to establish publication. Making the work available in that way, even assuming it constituted "distribution," did not involve "sale or other transfer of ownership, or by rental, lease or lending." Indeed, this result follows directly from the principle that "the projection or exhibition of a motion picture in theaters or elsewhere does not in itself constitute a publication."[45]

---

42 *Id.* ¶¶ 31, 38.

43 17 U.S.C. § 101.

44 *See generally* 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 4.08[A] (2005) (hereinafter NIMMER).

45 *Id.* § 4.11[A] (citing cases).

To be sure, "offering to distribute copies [of motion pictures] for the purpose of public showing in theaters" is "publication." *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1204 n.1 (9th Cir. 2003). But merely posting a digital file of a performance of the show on the Internet lacks the element of commercial exploitation involved in the motion picture distribution-for-exhibition situation. *See American Vitagraph, Inc. v. Levy*, 659 F.2d 1023, 1027-28 (9th Cir. 1981); 1 NIMMER § 4.11[A].

In view of the foregoing, the complaint fails to allege facts that, if proved, would permit the conclusion that the work has been published. In consequence, Section 412(1) precludes recovery of statutory damages or attorney fees for the alleged infringements prior to December 10, 2004, the effective date of the copyright registration.

*Conclusion*

The motion to dismiss the second amended complaint is granted to the extent that the third and fourth claims for relief and plaintiff's claim for statutory damages and attorneys fees for alleged copyright infringements prior to December 10, 2004 are dismissed. It is denied in all other respects.

SO ORDERED.

Dated: April 12, 2006

Lewis A. Kaplan
United States District Judge